# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

KENNETH LEE GREEN,     :

   Petitioner,     :

vs.          : CIVIL ACTION NO. 13-0004-WS-C

UNITED STATES OF AMERICA,  : CRIMINAL ACTION NO. 10-0116-WS-C

   Respondent.

## REPORT AND RECOMMENDATION

This cause is before the Court on petitioner Kenneth Lee Green's amended motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255 (Doc. 240)[1] and the testimony of witnesses during the January 15, 2014 evidentiary hearing in this matter (*see* Doc. 245). This action has been referred to the undersigned for entry of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Following consideration of all

---

[1] Petitioner Green initially filed his § 2255 motion to vacate in this Court on December 26, 2012. (Doc. 199, at 13.) Thereafter, he filed numerous memoranda in support of his motion or in reply to the government's response. (*See* Docs. 207-208, 210 & 214-216.) In setting this matter for an evidentiary hearing, the undersigned instructed appointed counsel to file an amended motion to vacate which would "control the disposition of petitioner's motion to vacate." (Doc. 224, at n.2, citing *Pintando v. Miami-Dade Housing Agency,* 501 F.3d 1241, 1243 (11th Cir. 2007) ("As a general matter, '[a]n amended pleading supersedes the former pleading; the original pleading is abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary.") and *Malowney v. Federal Collection Deposit Group,* 193 F.3d 1342, 1345 n.1 (11th Cir. 1999) ("An amended complaint supersedes an original complaint.").) This instruction was reiterated when retained counsel entered an appearance for Green (Doc. 228) and requested additional time to file an amended motion to vacate (Doc. 229). (*See* Doc. 230 ("[T]he amended motion to vacate must 'identify all potentially viable claims of ineffective of counsel which petitioner wishes to pursue during the evidentiary hearing[]' (Doc. 224, at 6) and, to this end, counsel '*cannot* incorporate by reference any portion of Green's motion to vacate (Doc. 199) or memoranda filed in support thereof (*see* Docs. 207-208, 210 & 214; *cf.* Docs. 215-216).'").) Inasmuch as the amended petition filed on December 17, 2013 (Doc. 240), is the controlling pleading in this case the undersigned simply determines that the motion to vacate filed on December 26, 2012 (Doc. 199) has been superseded.

relevant pleadings in this case, and the evidentiary hearing testimony, it is recommended that Green's amended § 2255 motion be **DENIED**.

## FINDINGS OF FACT

Kenneth Lee Green was an admitted methamphetamine user prior to his arrest on October 29, 2009. (*See* Doc. 141, T.T. 189-198.) Green allowed Stephen Terry Britt to use the shed behind his residence on ten to fifteen occasions to manufacture methamphetamine in exchange for which he received two or three grams of methamphetamine. (*See id.* at 192-193 & 196; *cf. id.* at 198 (Green's admission that the benefit to him of allowing people to use his residence was that he got free dope).)[2] In addition, petitioner's actual residence was used to manufacture methamphetamine. (*See, e.g.,* T.T. 54-57.)

On May 27, 2010, Green was indicted on one count of conspiracy to manufacture methamphetamine in violation of 21 U.S.C. § 846, one count of attempt to manufacture methamphetamine in violation of 21 U.S.C. § 846, and one count of using and carrying a firearm in connection with a drug trafficking offense and possession of a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A). (Doc. 1, at 1-3.)[3] Green made his initial appearance and was arraigned in this Court on June 18, 2010 (*see* Docs. 21 & 22), and was ordered detained on July 2, 2010 (Doc. 39).

By superseding indictment filed in open court on July 29, 2010, Green was again charged with one count of conspiracy to manufacture methamphetamine in violation of

---

[2] Green estimated that Carlos Lee McDonald used his shed to manufacture methamphetamine seven to ten times. (*Id.* at 197; *see also* T.T. 79-97 (McDonald's testimony).)

[3] The indictment contained a forfeiture allegation in which Green was named. (*See id.* at 4-5.)

21 U.S.C. § 846, one count of attempt to manufacture methamphetamine in violation of 21 U.S.C. § 846, and one count of using and carrying a firearm in connection with a drug trafficking offense and possession of a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A). (Doc. 67, at 1-3; *compare id. with* Doc. 1, at 1-3.) In addition, Green was charged with one count (Count 5) of unlawful possession of an unregistered firearm, in violation of 26 U.S.C. § 5861(d). (Doc. 67, at 3.)[4]

Green's case was tried over the course of two days, September 7 and 8, 2010 (*see* Doc. 141, at T.T. 1 & 212), and the jury reached a unanimous verdict finding Green guilty of all four counts of the superseding indictment in which he was charged. (*Compare id.* at 285 *with* Doc. 98, at 1-2.) With respect to the conspiracy to manufacture methamphetamine charge, the jury determined the quantity of the substance containing a detectable amount of methamphetamine that Green conspired to manufacture was 500 grams or more. (*See id.*) In addition, with respect to the gun charge in Count Four, the jury found Green guilty of both firearms. (*Id.*)

On March 18, 2011, Green was sentenced to a term of imprisonment of 412 months pursuant to the Sentencing Reform Act of 1984. (*See* Doc. 175, at 19.) "This consists of 292 months as to Count 1 and 3, 120 months as to Count 5, all such terms to run concurrently, and a hundred and twenty months as to Count 4, to be served consecutive to the sentence imposed in Counts 1, 3, and 5." (*Id.*) The defendant filed written notice of appeal on March 21, 2011 (Doc. 157), eight days before the Court entered its written judgment (Doc. 169; *see also* Doc. 170 (statement of reasons)). The Eleventh Circuit Court of Appeals affirmed Green's sentence by unpublished *per*

---

[4]     In the superseding indictment, the government specifically sought forfeiture of the firearms. (Doc. 67, at 6.)

*curiam* opinion issued on November 3, 2011. (Doc. 181.)

> The district court did not clearly err by enhancing Green's sentence for creating a substantial risk to the life of his children. A defendant is subject to a six-level increase of his offense level if his crime involved manufacturing methamphetamine and "created a substantial risk of harm to the life of a minor." United States Sentencing Manual Guidelines § 2D1.1(b)(13)(D). Even if Green's children were not present during the manufacturing of methamphetamine, the children faced a substantial risk of harm from volatile precursor materials that Green had stored in a shed near his trailer and from noxious fumes that would penetrate any porous surface inside his trailer where, according to a cohort, Green manufactured methamphetamine about once a week. In fact, when officers entered Green's trailer, the smell of ammonia was so overwhelming that they broke doors and windows to ventilate the trailer. Green had used screws to seal the doors and windows and, in so doing, blocked escape routes otherwise available to his children in the event of an emergency. Green created conditions around his home that were hazardous to the life of his children.

> The district court also did not clearly err by enhancing Green's sentence for perjury. A defendant faces a two-level increase in his offense level if he "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the . . . prosecution" of his crime. Id. § 3C1.1. The district court was entitled to find that Green offered "false testimony concerning a material matter with willful intent" to mislead jurors about his involvement in the manufacture of methamphetamine. United States v. Dunnigan, 507 U.S. 87, 94, 113 S.Ct. 1111, 1116 (1993). After law enforcement officers and cohorts testified about Green's possession of precursor materials and use of his home to manufacture methamphetamine, Green testified incredibly that he was not aware of the drug paraphernalia found in his bedroom, he did not allow methamphetamine to be manufactured in his trailer, and he did not notice the smell of ammonia in his trailer on the day of the search. Green argues that the district court failed to "make a specific finding" of perjury, but the district court found that Green's false testimony "was designed to send the jury in a direction away from the true facts of this case and . . . to mitigate Mr. Green's role in the offense."

> We **AFFIRM** Green's sentence.

(*Id*. at 2-4.)  This opinion issued as the mandate of the Eleventh Circuit on December 7, 2011 (Doc. 182) and the United States Supreme Court denied Green's petition for a writ of certiorari on January 17, 2012 (Doc. 183, at 2).

Green filed his motion to vacate, pursuant to 28 U.S.C. § 2255, on December 26, 2012. (Doc. 199, at 13 (date placed in the prison mailing system).) Green raised numerous claims of alleged ineffective assistance of trial and appellate counsel in this initial motion (*see id.*) and the various supporting memoranda he filed (*see* Docs. 207-208, 210 & 214-216). In the order setting this matter down for an evidentiary hearing (Doc. 224), as well as by subsequent order (Doc. 230), the undersigned instructed petitioner's attorney to file an amended § 2255 motion and clearly stated that the scope of the evidentiary hearing would be limited to those claims of ineffective assistance of counsel raised in the amended petition (*compare* Doc. 224, at 6 *with* Doc. 230, at 1). The amended petition has now been filed (Doc. 240) and therein Green raises the sole claim that trial counsel was constitutionally ineffective in failing to properly investigate and file a motion to suppress evidence prior to trial (*id.* at 6; *see also id.* at 7-17).

On September 6, 2012, Green filed a Motion for New Trial based on Newly Discovered Evidence, pursuant to Fed.R.Crim.P. 33. [Doc. No. 194].Therein, Green argued that, based on his recent receipt of his booking record from the Mobile County Metro Jail public website, he learned that the drugs, drug paraphernalia, and firearms were illegally obtained by Mobile County Sheriff's deputies following a warrantless search and seizure of his residence. This is because although the deputies arrived on his premises at 12:15 a.m. [Doc. No. 194, p.18], Deputy Raylene Busby did not obtain the search warrant to search the residence until 2:42 a.m. [Doc. No. 194, p.16].[5] Per the booking record, Green was processed into the Metro Jail at 2:13 a.m., for the drug paraphernalia, manufacturing, and firearms charges, which was almost half an hour before Deputy Busby even got the search warrant in order to conduct a valid search. [Doc. No. 194, p.13].

This indicated, argued Green, that the deputies illegally searched and seized his property without a valid search warrant [Doc. No. 194, p.2], an action that neither was challenged by trial counsel in a pre-trial motion to suppress nor a[t] trial. Then, Green stated, the error further was

---

[5]     "The return . . . reflects that the search was conducted at 2:55 a.m." (Doc. 202, at 1.)

compounded when defense counsel failed to object to or challenge the government at trial when it misled the jury into thinking that the search of his premises, which yielded the incriminating evidence against him, was conducted pursuant to a lawful search warrant.

       On November 14, 2012, the government filed its response in opposition to Green's Motion [Doc. No. 197], to which Green filed a Reply on December 3, 2012[] [Doc. No. 198]. On February 25, 2013, the Court denied the Motion [Doc. No. 202].

(Doc. 240, at 3-4.) In denying the petitioner's motion, the Court found both that Green

had failed to establish that he exercised due diligence in obtaining the "book in report"

and, further, that this evidence was cumulative of evidence in the defendant's

possession prior to trial. (Doc. 202, at 2-3.)

       The report filled out by Deputy Busby and provided the defendant in discovery reflects on its face that the defendant was arrested at 12:20 a.m. on October 29, 2009 for unlawful manufacture of a controlled substance, possession of a short-barrel shotgun, and possession of narcotic paraphernalia. (Doc. 194, Exhibit E). That is, a document in the defendant's possession long before his trial contains precisely the same information as his newly discovered evidence – that he was arrested on drug and gun charges before a search warrant to look for drugs and guns had been obtained. The defendant himself insists that Exhibit E shows that, "at 12:20 am (2420) on 10-29-09 Green and Britt are arrested for the items found in the warrantless search and seizure." (Doc. 194 at 7-8). That the defendant may not have recognized the potential significance of the evidence in his possession before trial does not permit him to seek a new trial based on the same evidence when it is presented to him a second time after trial.

(*Id*. at 3.)

During the evidentiary hearing on January 15, 2014, Green's trial attorney,

Domingo Soto, Esquire, testified that he will sometimes file a motion to suppress even if

he believes it is not meritorious and will not be granted. In Green's case, he remembered

his client raising a timing issue with respect to the search warrant and he also

remembered going to the booking room at the Mobile County Metro Jail to investigate

the matter but ultimately decided not to file a motion to suppress; he was unsure

whether he reached this conclusion because of a lack of information received from the booking room or because he felt the information he found was inconsistent with what Green was telling him. Either way, Mr. Soto testified he could not prove that the search was unconstitutional; therefore, he filed no motion to suppress.

Deputy Raylene Busby testified that on the night of October 28, 2009, Agent Kevin Wright received information from a confidential informant that a meth cook had just concluded at a residence on Glen Acres Drive in the northern portion of Mobile County. The informant also told Agent Wright that if a white truck exited the property surrounding the residence that "dope" would be in the truck. At the time this information was relayed to Busby, the case agent was still downtown; however, she headed to the northern part of the county and joined up with Agent Wright and others about the time—or just prior to the time—Daniel Conner was being pulled over in the white truck by investigating officers.[6] Conner told the officers that Britt was at the Glen Acres residence he had just left—a residence owned by a guy he only knew as "Ken"—a man (Britt) who had outstanding warrants for traffic tickets and who was known by officers as a meth cook and to be out on bond on a meth charge. In addition, Conner told the officers that he had been sent to buy a box of salt to finish the cook.[7] The officers, of which there were at least five or six, then returned to the Glen Acres Drive residence. Although the trailer was approximately 100 yards off the road and an iron gate could block access if closed, the iron gate was opened. Investigating officers drove onto the

---

[6] Several officers were obviously conducting surveillance of Green's Glen Acres residence at the time Conner exited the property in a white truck.

[7] As explained by Deputy Busby, the "cook" was being "smoked off" which required a box of salt. At this point, then, there was still a potential for a meth explosion according to Deputy Busby and Sgt. Alfonsi.

property at approximately 12:15 a.m. on October 29, 2009 and found the lights on in the trailer; some officers went to the backdoor and the shed behind the trailer[8] while Agent Wright went to the front door.

According to Sergeant Dawn Alfonsi, investigating officers approached the residence to conduct a "knock and talk" based upon the information received from the confidential informant about there having been a recent active meth cook and additional information that Britt was at the Glen Acres Drive residence. In other words, according to Alfonsi, the officers were interested in talking to the residents about the meth activity at the house, as well as determining whether Britt was still at the house. Agent Wright knocked on the front door and someone inside the trailer told him to go the backdoor. While Wright was knocking on the front door and then approaching the backdoor, Deputy Busby opened the door to the shed,[9] announced herself, performed a safety sweep, and then turned her attention to the trailer. By this time, Agent Wright was almost at the back deck. Deputy O'Shea and Sgt. Alfonsi were already on the back deck and O'Shea saw through a crack in the backdoor (the door was ajar) Britt walking down the hall carrying a glass jar that was smoking—in effect, a meth lab. The officers immediately entered the trailer and as they did they heard a crash (*see* Government's Exhibit 2B), saw a cloud of smoke, and were overwhelmed with the smell of ammonia. While Deputy O'Shea and Agent Wright struggled with Britt in and around the trailer

---

[8] Deputy Busby, along with Deputy O'Shea and others, went to the back of the trailer because they thought they saw someone fleeing in that area as they exited their vehicles.

[9] As Busby approached the shed, she smelled ammonia and heard a hum emanating from inside. The source of the hum was a fan which was carrying the ammonia smell outside.

bathroom, Alfonsi ordered the residence cleared of all people and ventilated.[10] Britt and Green were taken outside and placed under arrest,[11] the protective sweep was conducted,[12] and the trailer was ventilated. Deputy Raylene Busby then left the scene and went back downtown to secure a search warrant. As Busby was occupied with procuring the warrant, the other officers placed Green and Britt in a police car and then transported the two men to the Mobile Metro Jail.[13] The officers at Green's residence

[10]  Ultimately, numerous windows were broken and the front door—which was bolted shut—was kicked open. (*See* Government's Exhibit 2.)

[11]  At this time, approximately 12:20 a.m. on October 29, 2009, a probable cause arrest of Green was made on charges of the unlawful manufacturing of methamphetamine and possession of drug paraphernalia. (*See, e.g.,* Government's Exhibit 5.) Although this exhibit, along with Green's exhibits 1E and 1F—and even Government's Exhibit 6—reflect an arrest time of "2420" on October 29, 2009, such "military" time designation is incorrect as there are only 24 hours in each day; clearly, as reflected by her evidentiary hearing testimony, Deputy Busby intended to insert "0020" in those exhibits to designate 12:20 a.m. on October 29, 2009. That, or Busby though 2420 was military time for 12:20 a.m. Green's trial counsel, Mr. Soto, agreed with counsel for the government that if officers saw Britt running down the hall of the trailer with a meth lab in his hands and then entered the trailer to find the remnants of the lab in the bathtub, there would have been probable cause to arrest Green on manufacturing and possession of drug paraphernalia charges without a search warrant having been issued. Soto also testified if thereafter the officers obtained a search warrant and found in a search of the premises various firearms then it would be appropriate to charge Green with additional firearms charges.

[12]  During this sweep, Alfonsi saw open and obvious in the bathroom the material Britt was trying to make disappear; in particular, she saw a chalky substance she believed to be from a meth cook and discolored toilet water. (*See also* Government's Exhibit 2B.)

[13]  Ashanta McGee, the records supervisor at the Mobile Metro Jail, testified at the January 15, 2014 evidentiary hearing that jail records reflect that at 2:13:12 a.m. on October 29, 2009, an intake officer entered Green into the jail system. (*See also* Government's Exhibit 1.) According to McGee, the 2:13 a.m. time is not necessarily when Green arrived at the jail but is simply the time that Green was placed in the jail system by the intake officer. After intake and a housing determination, a defendant is taken to the booking office for processing, including the placement of charges. According to McGee, jail records reflect that at 2:43:06 a.m. on October 29, 2009, Green was booked into the jail for manufacturing a controlled substance in the first degree based on a probable cause arrest (Government's Exhibit 1A) and seconds later—at 2:43:58 a.m. on October 29, 2009—was booked into the jail on the basis of a probable cause arrest for possession of drug paraphernalia (Government's Exhibit 1B). Jail records further show that Green was not booked into the jail on the charge of possessing a short-barrel firearm until one day later on October 30, 2009, at 4:04:56 p.m.; this charge was added on the basis of an arrest warrant issued on October 30, 2009 while Green was in jail on the other charges (Government's (Continued)

waited in their cars until Busby could procure a search warrant; that process took approximately two hours, Mobile County District Judge Bob Sherling signing the warrant at 2:42 a.m. and the search being initiated by officers on the scene at 2:55 a.m. after receiving a call from Busby that the warrant had been signed.[14] The testimony of Busby and Alfonsi during the January 15, 2014 could not have been clearer: officers did not begin to search the trailer and shed until after Busby called sometime between 2:42 a.m. and 2:55 a.m. to tell officers on the scene that a search warrant had been signed.

As described at trial, discovered in the search of the trailer and shed were numerous items, including the following: (1) in the bathroom, a spotlight, two mugs containing white powder residue, a reddish "pill soak," a liquid substance from the toilet seat,[15] coffee filters, a digital scale, a clear Tupperware container full of crushed pseudoephedrine pills, a bottle of Liquid Fire drain cleaner, and a hair dryer (*see* Doc. 141, T.T. 35-37 & 69); (2) in the main living area, a security camera and a television monitor showing—at the time the picture was taken—the headlights of the deputies' vehicles (*see id.* at 38-39); (3) in the master bedroom, a shotgun from the top of a cabinet

---

Exhibit 1I.) This information is clear from this jail document even though the document also contains—at the top left hand portion of the document—the time of Green's intake into the jail— 2:13:12 a.m. on October 29, 2009. (*See id.*) This accounts for the "Booking" record submitted by petitioner—and supplied by the Mobile County Sheriff's Office—showing that Green was "booked" into the jail on all three charges on October 29, 2009 at 2:13 a.m. (*See* Defendant's Exhibit 1A.) In essence, regardless of when the charges were actually leveled against Green— whether 2:43 a.m. on October 29, 2009 or 4:04 p.m. on October 30, 2009—they were later all tied to the time (2:13 a.m.) Green was processed into the jail on October 29, 2009.

[14]     Of course, by the time Busby returned to Green's residence, Green, Britt and Conner had already been transported to the Mobile County Metro Jail.

[15]     During the trial, Britt did not deny dumping a methamphetamine-manufacturing liquid substance in the trailer bathtub; however, it was his story that Daniel Conner had left the substance in the bathroom. (*Id.* at 160-161; *see also id.* at 160 ("I smelled the stuff when I got there[.]"); *id.* at 168 ("Danny Wayne [Conner] was doing the cooking.").)

(*compare* Government's Exhibit 2C *with* Exhibit 2E),[16] clear tubing, straws, glass pipes with burned residue, and clear baggies from the desk area, a propane bottle with a connected torch, along with glass jars, on a shelf above the desk, a shotgun shell recovered from a desk drawer, and 12-gauge shotgun shells in the closet (Doc. 141, T.T. 39-40, 41, 42, 52, 69); (4) in the kitchen, a box of cold and sinus pseudoephedrine (*id.* at 42); and (5) in the outside shed, two Coleman fuel cans, a Coleman fuel plastic jug, a .410 shotgun on a make-shift table shelf, coffee filters, a bucket containing tubing, and bags of ammonia nitrate and a box of tubing found inside a workbox (*id.* at 43-45).[17]

## CONCLUSIONS OF LAW

Section 2255 reads, in relevant part, as follows: "A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a).

Green's sole argument is that constitutionally ineffective assistance of counsel entitles him to the relief afforded by 28 U.S.C. § 2255. In the run-of-the-mill ineffective assistance of counsel case, in order to establish a claim a petitioner is required to show

---

[16] There is simply no evidence that any of the officers obtained the shotgun from the trailer—or even knew about its existence—prior to the search conducted pursuant to a warrant, which began at 2:55 a.m. on October 29, 2009.

[17] *See also* Government's Exhibit 4 (search warrant return which reflects all items identified at trial as well as some other items); *see* Government's Exhibit 6, at 6-7 (list of items removed from the trailer and shed).

(1) that his attorney's representation fell below "an objective standard of reasonableness" and (2) that a reasonable probability exists that but for counsel's unprofessional conduct, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *see also Jones v. United States*, 478 Fed.Appx. 536, 539-540 (11th Cir. Sept. 23, 2011) ("To make a successful claim of ineffective assistance of counsel, a defendant must show that: (1) his counsel's performance was deficient; and (2) the deficient performance prejudiced his defense.").[18] "The burden of persuasion is on a section 2255 petitioner to prove, by a preponderance of the competent evidence, both that counsel's performance was unreasonable, and that []he was prejudiced by that performance." *Demar v. United States*, 228 Fed.Appx. 940, 950 (11th Cir. Jun. 21, 2007) (quotation marks, brackets and citations omitted); *see also Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001) ("The petitioner bears the burden of proof on the 'performance' prong as well as the 'prejudice' prong of a *Strickland* claim, and both prongs must be proved to prevail."), *cert. denied sub nom. Johnson v. Nagle*, 535 U.S. 926, 122 S.Ct. 1295, 152 L.Ed.2d 208 (2002).[19]

> The performance prong of the ineffective assistance standard entails a deferential review of counsel's conduct. In assessing the reasonableness of counsel's performance, courts must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.[20] Thus, the Sixth Amendment does not

---

[18]     "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2.

[19]     It is proper in considering claims made by a federal prisoner under § 2255 to look for guidance from cases discussing claims raised by state prisoners under 28 U.S.C. § 2254. *See Hagins v. United States*, 267 F.3d 1202, 1205 (11th Cir. 2001) (citing *Holladay v. Haley*, 209 F.3d 1243 (11th Cir. 2000)), *cert. denied*, 537 U.S. 1022, 123 S.Ct. 545, 154 L.Ed.2d 432 (2002).

[20]     In order to satisfy the first prong, "the petitioner must establish that no competent counsel would have taken the action that his counsel did take[.]" *Hall v. Thomas*, 611 F.3d 1259, 1290 (11th Cir. 2010) (quotation marks and citation omitted).

require criminal defense attorneys to take a nothing to lose approach and raise every available nonfrivolous defense.

      With respect to prejudice, courts ask whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

*Means v. Secretary, Department of Corrections,* 433 Fed.Appx. 852, 855 (11th Cir. Jul. 12, 2011) (internal quotation marks and citations omitted; footnote added), *cert. denied sub nom. Means v. Tucker,* ___ U.S. ___, 132 S.Ct. 1580, 182 L.Ed.2d 198 (2012); *see also Pair v. Cummins,* 373 Fed.Appx. 979, 981-982 & 982 (11th Cir. Apr. 20, 2010) ("The performance prong of an ineffective assistance claim requires the petitioner to show that, considering all the circumstances, his attorney's representation fell below an objective standard of reasonableness. The standard is that of a reasonable attorney, not a paragon of the bar or an Aristotle or a Clarence Darrow. Moreover, judicial review of an attorney's performance is highly deferential, and the court must eliminate the distorting effects of hindsight and evaluate performance from the attorney's perspective at the time the challenged conduct occurred. In so doing, the court must indulge a strong presumption that the attorney's conduct was objectively reasonable. A petitioner fails to overcome that presumption if the challenged conduct might be considered sound trial strategy. . . . Pair must [also] establish prejudice. It is not enough for him to show that his counsel's deficient performance had some conceivable effect on the jury's verdict. Instead, Pair must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (internal quotation marks and citations omitted)).

    Given the two-prong nature of the test for adjudicating ineffective-assistance-of-counsel claims, it can come as no surprise that "'the cases in which habeas petitioners

can properly prevail on the ground of ineffective assistance of counsel are few and far between.'" *Johnson, supra,* 256 F.3d at 1176 (citation omitted). When applying the *Strickland* standard, it is clear that courts "are free to dispose of ineffectiveness claims on either of its two grounds." *Oats v. Singletary*, 141 F.3d 1018, 1023 (11th Cir. 1998) (citation omitted), *cert. denied sub nom. Oats v. Moore*, 527 U.S. 1008, 119 S.Ct. 2347, 144 L.Ed.2d 243 (1999); *see also Adamson v. United States,* 288 Fed.Appx. 591, 594 (11th Cir. Jul. 29, 2008) ("The defendant must satisfy both prongs of this test to show a Sixth Amendment violation; if the defendant fails to demonstrate one of these prongs sufficiently, we do not need to address the other."), *cert. denied,* 555 U.S. 1010, 129 S.Ct. 526, 172 L.Ed.2d 385 (2008); *Butcher v. United States*, 368 F.3d 1290, 1293 (11th Cir. 2004) ("[O]nce a court decides that one of the requisite showings has not been made it need not decide whether the other one has been.").

In light of the specifics of Green's sole claim of ineffective assistance of counsel, to prevail on that claim he actually must establish three prongs (rather than two), namely: "'(1) that counsel's representation fell below an objective standard of reasonableness, (2) that the Fourth Amendment claim is meritorious, and (3) that there is a reasonable probability that the verdict would have been different absent the excludable evidence.'" *Borden v. United States,* 2010 WL 2803969, *7 (M.D. Fla. Jul. 15, 2010), quoting *Zakrzewski v. McDonough,* 455 F.3d 1254, 1260 (11th Cir. 2006). In this case, Green cannot establish that his attorney's representation fell below an objective standard of reasonableness nor can he establish that his Fourth Amendment claim is meritorious; therefore, Green is not entitled to relief pursuant to 28 U.S.C. § 2255.

A. **Performance Prong**. Green would like for this Court to infer Mr. Soto's incompetence in this regard based simply upon his trial attorney's evidentiary hearing

admission that on occasion he will file a motion to suppress even though he is aware the motion will most likely not be granted. What Green would like this Court to forget, however, is Mr. Soto's additional testimony that he went to the "booking room" at the Mobile County Metro Jail to investigate his client's concerns about the timing of the search warrant and ultimately concluded that he could not prove a Fourth Amendment violation. This testimony establishes two important things, namely, that counsel did investigate the propriety of filing a motion to suppress and, second, that Mr. Soto chose to eschew filing a motion to suppress upon determining that he could not establish a Fourth Amendment violation. In addition to the foregoing, the undersigned finds it of paramount importance that counsel for Green's co-defendant Steven Terry Britt did not file a motion to suppress evidence even though the "timing" issues were the same for these two defendants. Thus, Green cannot establish the first prong of the relevant inquiry because his trial attorney's actions—in investigating whether to file a motion to dismiss and deciding not to file such a motion because he could not prove a Fourth Amendment violation—do not fall outside the wide range of reasonable professional assistance, particularly when the Court takes into consideration that Britt's retained counsel did not file a motion to suppress. *Compare Hall, supra,* 611 F.3d at 1290 ("[T]he petitioner must establish that no competent counsel would have taken the action that his counsel did take[.]") *with Brown v. United States,* 219 Fed.Appx. 917, 918 (11th Cir. Mar. 7, 2007) ("'The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer . . . could have acted, in the circumstances, as defense counsel acted . . . .'"), *cert. denied,* 552 U.S. 856, 128 S.Ct. 132, 169 L.Ed.2d 91 (Oct. 1, 2007), and *Tapanes v. United States,* 2012 WL 2944859, *2 (M.D. Fla. Jul. 18, 2012 ("To be objectively

15

unreasonable, the performance must be such that no competent counsel would have taken the action."). In addition, it is well established in the Eleventh Circuit that "'the failure to raise nonmeritorious issues does not constitute ineffective assistance.'" *Lahens v. United States*, 394 Fed.Appx. 646, 647 (11th Cir. Aug. 27, 2010) (bracket omitted) (quoting *Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994)), *cert. denied*, 131 S.Ct. 2474, 179 L.Ed.2d 1231 (2011); *see also, e.g., Brown v. Florida Attorney General*, 230 Fed.Appx. 896, 899 (11th Cir. May 2, 2007) ("An attorney is not ineffective for failing to raise a nonmeritorious issue."), *cert. denied sub nom. Brown v. McCollum*, 552 U.S. 906, 128 S.Ct. 219, 169 L.Ed.2d 180 (2007). The undersigned agrees with Mr. Soto that Green had no meritorious Fourth Amendment claim to raise, as explained in some detail below; therefore, trial counsel was not ineffective for failing to file a non-meritorious motion to suppress. *See Tapanes, supra*, at *2 & 4 ("An attorney is not ineffective for failing to raise or preserve a meritless issue. . . . [T]he officers did not violate the Fourth Amendment by approaching the house to speak with the occupant, and needed no particular quantum of evidence before deciding to do so. The search warrant for Petitioner's home was not based on the anonymous tip alone; rather, it was based on the officers' observations when they were lawfully at the house occupied by Petitioner for the 'knock and talk.' Observations of illegal activities are 'precisely what a judicial officer needs to provide a basis for a warrant.' The search warrant was clearly based on probable cause, and defense counsel had no basis to file a motion challenging it. Therefore, no ineffective assistance of counsel resulted from the failure to file a motion challenging the search warrant, and there was no basis for the trial court to suppress the evidence.").

**B.** **Merits of Fourth Amendment Claim**. The Fourth Amendment provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. CONST. amend. IV. And while "[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable[,]" *United States v. Santa,* 236 F.3d 662, 668 (11th Cir. 2000) (quotation marks and citation omitted), it is just as clear that the Fourth Amendment "is not implicated by entry onto private land for legitimate police purposes unconnected with a search of the premises." *United States v. Pupo-Reynaldo,* 470 Fed.Appx. 873, 877 (11th Cir. Jun. 19, 2012), citing *United States v. Taylor,* 458 F.3d 1201, 1204 (11th Cir. 2006). In other words, the Eleventh Circuit recognizes a "knock and talk" exception to the warrant requirement set forth in the Fourth Amendment whereby "'[a]bsent express orders from the person in possession,[21] an officer may walk up the steps and knock on the door of any man's castle, with the honest intent of asking questions of the occupant thereof.'" *Id.* (footnote added), quoting *Taylor, supra; see also Taylor, supra,* 458 F.3d at 1204 ("Thus, '[o]fficers are allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just a[s] any private citizen may.'"); *Hill v. Macon Police Dept.,* 2013 WL 594200, *7 (M.D. Ga. Feb. 15, 2013) ("The 'knock and talk' is a warrantless, investigative tactic used by police officers to obtain information related to

---

[21]    "When an owner makes apparent an intent to exclude the public from his property by placing a lock on the entry gate, or posting on the fence 'No Trespassing' signs or the like, the knock and talk exception is inapplicable because 'the act of sealing the property creates an elevated expectation of privacy' so that the owner can reasonably expect all visitors to cease." *United States v. Byle,* 2011 WL 1983359, *12 (M.D. Fla. Apr. 15, 2011), *report and recommendation adopted,* 2011 WL 1983355 (M.D. Fla. May 20, 2011), *reconsideration denied,* 2011 WL 2435349 (M.D. Fla. Jun. 16, 2011).

an investigation from people inside a house. The Eleventh Circuit recognizes the constitutional validity of this tactic[.]"). The approach of law enforcement officials to a residence "is not restricted to the front door. If it appears that someone is in or around a house, officers may take reasonable steps to initiate contact by going to other areas of the property." *United States v. Guba,* 2010 WL 472625, *2 (N.D. Fla. Feb. 5, 2010), citing *Taylor, supra,* 458 F.3d at 1204-1205 and *Hardesty v. Hamburg Tp.,* 461 F.3d 646, 654 (6th Cir. 2006).

During the evidentiary hearing on January 15, 2014, Sgt. Dawn Alfonsi testified that officers approached Green's trailer on Glen Acres Drive to conduct a "knock and talk." The officers' approach to the trailer and surrounding area was not hindered in any manner, Deputy Busby testifying that the gate on the property was open. And because some officers saw someone running in the area around the back of the trailer they headed toward the backdoor, a destination to which Agent Wright soon arrived after knocking on the front door and being invited by Green to go to the backdoor because the front door would not open. *Compare United States v. Lara-Mondragon,* 516 Fed.Appx. 771, 772 & 773 (11th Cir. Apr. 9, 2013) ("While a 'knock and talk' may, by the terms of its designation, presuppose an encounter at the residence's front door, officers may move away from the front door so long as they do so for a legitimate purpose unconnected to a search of the premises. . . . Importantly, as has long been recognized, officer safety is a concern whenever officers and arrestees or potential arrestees are in close proximity.") *with United States v. Diaz,* 404 Fed.Appx. 381, 383 (11th Cir. Dec. 7, 2010) ("During the course of a knock and talk, officers may take reasonable steps to initiate contact by visiting areas of the property other than the front door."). And regardless of whether the officers wanted to talk to the residents about

18

methamphetamine activity allegedly taking place on the grounds or to determine whether Steven Terry Britt was at the residence, the officers' initial approach to Green's trailer (and shed) to talk to him—and any other occupant—did not implicate (much less violate) Green's Fourth Amendment rights inasmuch as it is clear to the undersigned that the officers intended to pursue a constitutionally valid "knock and talk." *See Hill, supra,* at *7 ("The 'knock and talk' is a [constitutionally valid] warrantless, investigative tactic used by police officers to obtain information related to an investigation from people inside a house."). Green's argument that police had enough information from the confidential informant and Conner to establish probable cause to obtain a search warrant prior to their entry on Green's property simply does not advance his position. This is because "[f]aulting the police for failing to apply for a search warrant at the earliest possible time after obtaining probable cause imposes a duty that is nowhere to be found in the Constitution." *Kentucky v. King,* 563 U.S.      ,      , 131 S.Ct. 1849, 1861, 179 L.Ed.2d 865 (2011). Indeed, as the Supreme Court recognized in *King*, there are numerous valid reasons why law enforcement officers may not obtain a search warrant prior to conducting a "knock and talk":

> First, the police may wish to speak with the occupants of a dwelling before deciding whether it is worthwhile to seek authorization for a search. They may think that a short and simple conversation may obviate the need to apply for and execute a warrant. Second, the police may want to ask an occupant of the premises for consent to search because doing so is simpler, faster, and less burdensome than applying for a warrant. A consensual search also "may result in considerably less inconvenience" and embarrassment to the occupants than a search conducted pursuant to a warrant. Third, law enforcement officers may wish to obtain more evidence before submitting what might otherwise be considered a marginal warrant application. Fourth, prosecutors may wish to wait until they acquire evidence that can justify a search that is broader in scope than the search that a judicial officer is likely to authorize based on the evidence then available. And finally, in many cases, law enforcement may not want to execute a search warrant that will disclose the existence of an investigation because doing so may interfere with the acquisition of

additional evidence against those already under suspicion or evidence about additional but as yet unknown participants in a criminal scheme.

*Id.* at _____, 131 S.Ct. at 1860 (internal citations omitted). Thus, the officers' initial approach to Green's residence and initial encounter with Green constituted a valid "knock and talk" that did not in any manner implicate the Fourth Amendment. *See id.* at ___, 131 S.Ct. at 1860-1861 ("We have said that '[l]aw enforcement officers are under no constitutional duty to call a halt to criminal investigation the moment they have the minimum evidence to establish probable cause.'").

Before Green could reach the backdoor to speak with the officers, Deputy O'Shea observed through a crack in the backdoor a man he recognized as Steven Terry Britt walking down the hall carrying a meth lab and when O'Shea and Wright entered the trailer to try to prevent the destruction of drug evidence, they heard a crash. While O'Shea and Wright struggled with Britt in and around the bathroom of the trailer, other officers followed to conduct a protective sweep for other occupants and to ventilate the trailer due to the overwhelming smell of ammonia. This warrantless entry into Green's trailer was justified under the exigent circumstances exception to the search warrant requirement of the Fourth Amendment. *Compare McClish v. Nugent,* 483 F.3d 1231, 1240-1241 (11th Cir. 2007) ("Warrantless entry into the home is therefore unreasonable, subject only to a few 'jealously and carefully drawn' exceptions. . . . A second exception to the warrant requirement is made for 'exigent circumstances,' . . . [including] exigent circumstances entries . . . to prevent the destruction of evidence[.]") *with Santa, supra,* 236 F.3d at 669 ("Recognized situations in which exigent circumstances exist include: '. . . . risk of loss, destruction, removal, or concealment of evidence . . . .' This circuit has recognized that 'the need to invoke the exigent circumstances exception to the warrant requirement is "particularly compelling in narcotics cases" because narcotics can be so

quickly destroyed.' . . . 'The test of whether exigent circumstances exist is an objective one. "[T]he appropriate inquiry is whether the facts . . . would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured."'"); *see King, supra,* at ___, 131 S.Ct. at 1853-1854 ("It is well established that 'exigent circumstances,' including the need to prevent the destruction of evidence, permit police officers to conduct an otherwise permissible search without first obtaining a warrant."). In other words, there is no question but that the facts presented in this case—and just outlined above—would lead any reasonable law enforcement officer to believe that evidence might be destroyed (and, indeed, was being destroyed) before a search warrant could be secured; therefore, the warrantless entry into Green's trailer was lawful.

As explained during the evidentiary hearing, after conducting a protective sweep, clearing the trailer of all occupants, and ventilating the trailer, the officers did not conduct a search without benefit of a warrant; instead, the search of the trailer and shed was performed some two hours later (at 2:55 a.m. on October 29, 2009) after a search warrant was procured by Deputy Busby. Significantly,  it was during that search, pursuant to a warrant based on probable cause, that the officers discovered a sawed-off shotgun in Green's bedroom.  Green argues that the search of his property did not take place at 2:55 a.m. but, instead, took place sometime prior to 2:13 a.m. since a record produced by the Mobile County Sheriff's Office reflects that his "booking date" into the Mobile County Metro Jail on charges of manufacturing methamphetamine, possession of drug paraphernalia, ***and*** possession of a short-barreled firearm was October 29, 2009 at 2:13 a.m. (*See* Defendant's Exhibit 1A.) And since the search warrant was not signed by Mobile County District Judge Bob Sherling until 2:42 a.m. on October 29, 2009, it is

Green's position that law enforcement officers obviously discovered the sawed-off shotgun,[22] and other items, pursuant to an illegal warrantless search sometime prior to 2:13 a.m.

As indicated above, the undersigned is not convinced by this argument. Instead, the undersigned believes, and finds credible, the testimony of Deputy Busby and Sgt. Alfonsi that officers did not search Green's trailer and shed until after Judge Sherling's issuance of a search warrant. Indeed, the evidentiary hearing testimony of Ashanta McGee, the supervisor of records at the Mobile County Metro Jail, and other jail records serve to underscore the testimony of Busby and Alfonsi. McGee specifically testified that at 2:13 a.m. on October 29, 2009, Green was placed into the Mobile County Metro Jail system at "intake,"[23] after which he was taken to the booking office and charges placed against him. And other records produced by the Mobile County Metro Jail reflect that Green was actually processed—or "booked"—into the jail on charges of manufacturing a controlled substance (methamphetamine) and possession of drug paraphernalia at 2:43 a.m. (not 2:13 a.m.) on October 29, 2009 (Government's Exhibits 1A & 1B),[24] consistent with McGee's testimony that following "intake" arrestees are

---

[22]   The shotgun is the key to Green's argument inasmuch as it is clear that officers would have had sufficient information based on the exigent circumstances entry into his trailer to charge him with manufacturing methamphetamine and possession of drug paraphernalia.

[23]   As McGee explained, 2:13 a.m. only represents the time Green was placed into the jail system, not when he arrived at the jail on October 29, 2009.

[24]   Green's arrest on these two charges was a probable cause arrest based upon evidence in plain view when the officers entered the house in an attempt to prevent Britt from destroying drug evidence. As reflected on the arrest report completed by Deputy Busby on October 29, 2009 at 9:20 p.m. (Government's Exhibit 5), Green (at that time) had yet to be arrested for possessing the short-barreled shotgun (*see id*.). Although this weapon had been discovered and seized during the 2:55 a.m. search of Green's trailer and appears on Busby's report (*see id*.), there is no time or date of arrest on the form because Green had yet to be arrested on that charge; (Continued)

taken to the "booking room" for processing. Further similar evidence reflects that Green was not actually "processed" or "booked" into the jail on the charge of possessing a short-barreled firearm until 4:04 p.m. on October 30, 2009 on the basis of an arrest warrant (*see* Government's Exhibit I), again consistent with McGee's testimony that if charges are added with respect to an individual already incarcerated in the jail those charges are added following the issuance of an arrest warrant. All these just-referenced documents, which reflect exactly when Green was actually processed in jail on the different charges directly pertinent to this case (either 2:43 a.m. on October 29, 2009 or 4:04 p.m. on October 30, 2009) also contain the "intake" time of 2:13 a.m. on October 29, 2009. (*See* Government's Exhibits 1A, 1B & 1I.) Thus, the undersigned finds that the time Green was entered into the jail's computer system on October 29, 2009 (2:13 a.m.), was simply the "default" time for purposes of the "bookings and arrest history" document produced by the Mobile County Sheriff's Office and then supplied to this Court by counsel for Green (*see* Defendant's Exhibit 1A) because that time is the only consistent time reflected on all the relevant paperwork produced by the Mobile County Sheriff's Office (*compare id. with* Government's Exhibits 1A-1I). Because Defendant's Exhibit 1A reflects nothing more than the time of Green's "intake" into the jail's computer system, as opposed to the actual times Green was "processed" with respect to the various "charges"—some nine in number—following his 12:20 a.m. arrest on October 29, 2009,[25]

_____

as aforesaid, he was arrested for the short-barreled shotgun—on the basis of an arrest warrant—on October 30, 2009 (Government's Exhibit 1I).

[25]    Green's reference to other documents containing incorrect times does not advance his argument because those "mistakes" can easily be explained. For instance, the numerous references to "2420" on October 29, 2009 (*see, e.g.,* Defendant's Exhibits 1D-1F) are clearly incorrect as there are only 24 hours in a day.  As  explained during the evidentiary hearing, the (Continued)

petitioner's argument that law enforcement officers conducted a warrantless search of his trailer and shed does not bear fruit. The search of Green's trailer and shed was decidedly constitutional.

The evidence presented at the evidentiary hearing reveals no basis for the trial court to have suppressed any evidence seized by law enforcement officers and since petitioner's Fourth Amendment claim is not meritorious, no ineffective assistance of counsel—by Mr. Soto—resulted from the failure to file a motion to suppress.

In consideration of the foregoing, the Magistrate Judge recommends that the Court deny Green's motion to vacate, set aside or correct his sentence under 28 U.S.C. § 2255. Moreover, pursuant to Rule 11(a) of the Rules Governing § 2255 Proceedings, the undersigned recommends that a certificate of appealability in this case be denied. 28 U.S.C. foll. § 2255, Rule 11(a) ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."). The habeas corpus statute makes clear that an applicant is entitled to appeal a district court's denial of his habeas corpus petition only where a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1). A certificate of appealability may issue only where

---

correct time was "0020" military time, or 12:20 a.m. on October 29, 2009, the time Green was arrested on charges of unlawful possession of methamphetamine and possession of drug paraphernalia (*see* Defendant's Exhibit 1E).

There are no other exhibit dates or times that give rise to any concerns. (*See, e.g.,* Defendant's Exhibits 1C & 1G-1I.) Based on the evidentiary hearing testimony and other documentary evidence presented, Deputy Steve Leger took no "measurements from a suspected meth lab that was seized" on October 28, 2009 (*see* Defendant's Exhibit 1C) because by all accounts officers did not set foot on Green's property until after midnight on October 29, 2009. As for the property form, it is certainly credible that this form was typed up at approximately 9:20 p.m. on October 29, 2009 (*see* Defendant's Exhibit 1G). Finally, the undersigned perceives nothing untoward by the testing of two quart jars for prints on October 29, 2009 and October 30, 2009, or the various times reflected on these two documents (*see* Defendant's Exhibits 1H-1I).

"the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2243(c)(2). Where, as here, a habeas petition is being denied entirely on the merits of an underlying constitutional claim, a COA should issue only when the petitioner demonstrates "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong[,]" *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 1604, 146 L.Ed.2d 542 (2000); *see also id.* at 483–84, 120 S.Ct. at 1603-1604 ("To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot*, includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"). With respect to Green's sole claim of ineffective-assistance-of-counsel, the undersigned recommends that the Court find that reasonable jurists could not debate whether his § 2255 motion to vacate should be resolved in a different manner or that the issue presented is adequate to deserve encouragement to proceed further. Accordingly, petitioner is not entitled to a certificate of appealability as to this claim.

Rule 11(a) further provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." If there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation. *Brightwell v. Patterson*, CA 11-0165-WS-C, Doc. 14 (Eleventh Circuit order denying petitioner's motions for a COA and to appeal IFP in a case in which this Court set out the foregoing procedure); *see also Castrejon v. United States*, 2011 WL 3241817, *20 (S.D. Ala. June 28, 2011) (providing for the same procedure), *report and*

*recommendation adopted,* 2011 WL 3241580 (S.D. Ala. July 29, 2011); *Griffin v. DeRosa,* 2010 WL 3943702, at *4 (N.D. Fla. Sept. 20, 2010) (providing for same procedure), *report and recommendation adopted sub nom. Griffin v. Butterworth,* 2010 WL 3943699 (N.D.Fla. Oct. 5, 2010).

## CONCLUSION

The Magistrate Judge is of the opinion that petitioner's rights were not violated in this cause and that his amended request to vacate, set aside or correct his sentence (Doc. 240) should be **DENIED**. Petitioner is not entitled to a certificate of appealability and, therefore, he is not entitled to appeal *in forma pauperis*.

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72(b); S.D.ALA. L.R. 72.4. The parties should note that under Eleventh Circuit precedent, "the failure to object limits the scope of [] appellate review to plain error review of the magistrate judge's *factual findings*." *Dupree v. Warden*, 715 F.3d 1295, 1300 (11th Cir. 2013) (emphasis in original). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this the 4th day of February, 2014.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**